Douglas W. Crandall, ISB No. 3962
CRANDALL LAW OFFICE
212 2nd Ave W, Suite 104
Twin Falls, ID  83301
Telephone:  (208) 343-1211
crandall_law@msn.com

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STEVEN MORALES, a citizen of Idaho, individually, on behalf of and as natural guardian of his minor daughters S.M. and A.M., and on behalf of the heirs of the deceased minor S.A.M.; BRANDI MORALES, a citizen of Idaho, individually, on behalf of and as natural guardian of her minor daughters S.M. and A.M., and on behalf of the heirs of the deceased minor S.A.M.; ANN MORALES, a citizen of Idaho, individually; S.M., a citizen of Idaho, a minor, by and through her natural guardians and father and mother Steven Morales and Brandi Morales; A.M., a minor, by and through her natural guardians and father and mother Steven Morales and Brandi Morales, <br><br>         Plaintiffs, <br><br> vs. <br><br> FORD MOTOR COMPANY, a Delaware corporation with its principal place of business located in Michigan; THE GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation with its principal place of business located in Ohio; GOODYEAR CANADA INC., a Canadian corporation with its principal place of business located in Canada; ZF FRIEDRICHSHAFEN AG, a German corporation with its principal place of business located in Germany; TRW VEHICLE SAFETY SYSTEMS INC., a Delaware Corporation with its principal place of business located in Michigan; TRW AUTOMOTIVE INC., | Civil No. _____ <br><br> COMPLAINT AND DEMAND FOR JURY TRIAL |

a Delaware corporation with its principal place of business located in Michigan; ZF ACTIVE SAFETY AND ELECTRONICS US LLC, a Delaware corporation with its principal place of business located in Michigan; ZF PASSIVE SAFETY SYSTEMS US LLC, a Delaware corporation with its principal place of business located in Michigan; ZF TRW AUTOMOTIVE HOLDINGS CORP., a Delaware corporation with its principal place of business located in Michigan; ZF NORTH AMERICA, INC., a Delaware corporation with its principal place of business located in Michigan; ZF ACTIVE SAFETY US INC., a Delaware corporation with its principal place of business located in Michigan,

Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW the Plaintiffs, by and through their undersigned attorneys, and for their Complaint and claims for relief against the Defendants, state as follows:

## INTRODUCTION

1.    This is a product liability and wrongful death action to recover damages suffered by the Plaintiffs arising out of an automobile rollover crash on or about March 16, 2024 in Elmore County, Idaho and involving a 2003 Ford Expedition vehicle. The deceased minor, S.A.M., suffered fatal injuries in the accident. Plaintiffs Steven Morales, Brandi Morales, and Ann Morales, and minor Plaintiffs S.M. and A.M. ("Plaintiffs"), suffered personal injuries in the accident, and the named Plaintiffs suffered injuries and damages. Plaintiffs seek damages for wrongful death and personal injuries.

**PARTIES**

2.      Plaintiff STEVEN MORALES is a citizen of Idaho, the husband of Plaintiff Brandi Morales, the father of the deceased minor S.A.M., the father of Plaintiffs Ann Morales, S.M., and A.M., and the natural guardian of the minor Plaintiffs S.M. and A.M. He brings this wrongful death and personal injury action individually, as natural guardian of S.M. and A.M., and on behalf of the heirs of the deceased minor S.A.M.

3.       Plaintiff BRANDI MORALES is a citizen of Idaho, the wife of Plaintiff Steven Morales, the mother of the deceased minor S.A.M., the mother of Plaintiffs Ann Morales, S.M., and A.M., and the natural guardian of the minor Plaintiffs S.M. and A.M.  She brings this wrongful death and personal injury action individually, as natural guardian of S.M. and A.M., and on behalf of the heirs of the deceased minor S.A.M.

4.      Plaintiff ANN MORALES is a citizen of Idaho and the daughter of Steven  Morales and Brandi Morales.  She brings this wrongful death and personal action individually.

5.      Plaintiff S.M., a minor, is a citizen of Idaho and the daughter of Steven Morales and Brandi Morales. She brings the wrongful death and personal injury claims asserted herein through her father and mother and natural guardians Steven Morales and Brandi Morales.

6.      Plaintiff A.M., a minor, is a citizen of Idaho and the daughter of Steven Morales and Brandi Morales. She brings the wrongful death and personal injury claims asserted herein through her father and mother and natural guardians Steven Morales and Brandi Morales.

7.      STEVEN MORALES, BRANDI MORALES, ANN MORALES, S.M., and A.M. may hereinafter collectively be referred to as "Plaintiffs."

8.      Defendant FORD MOTOR COMPANY is a Delaware corporation with its principal place of business in Michigan, and which transacts business in Idaho and directly and through

others distributes, markets, and sells its products in Idaho, including the subject 2003 Ford Expedition believed to bear Vehicle Identification Number ("VIN") 1FMPU16L13LB57903 made the basis of this lawsuit. Defendant FORD MOTOR COMPANY, although a citizen of a state other than Idaho, is authorized to do business in Idaho and does conduct business in Idaho, deriving substantial economic profits in this state. FORD MOTOR COMPANY can be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. FORD MOTOR COMPANY may hereinafter be referred to as "Ford."

9. Defendant THE GOODYEAR TIRE & RUBBER COMPANY is an Ohio corporation with its principal place of business in Ohio and which does business in Idaho and directly and through others distributes, markets, and sells its products in Idaho, including the subject P265/70R17 Goodyear tire believed to bear DOT number 4BT6 BYER 3217 that is also made the basis of this lawsuit. Defendant The Goodyear Tire & Rubber Company, although a citizen of a state other than Idaho, is authorized to do business in Idaho and does conduct business in Idaho, deriving substantial economic profits in this state. The Goodyear Tire & Rubber Company can be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

10. Defendant GOODYEAR CANADA INC. is a Canadian corporation with its principal place believed to be located in Ontario, Canada and which does business in Idaho and directly and through others distributes, markets, and sells its products in Idaho, including the subject P265/70R17 Goodyear tire believed to bear DOT number 4BT6 BYER 3217 that is also made the basis of this lawsuit. Defendant Goodyear Canada Inc., although a Canadian corporation,

4

conducts business in Idaho by selling its products in Idaho. Goodyear Canada Inc. can be served with process at its headquarters location in Ontario.

11. It is believed that Goodyear Canada Inc. is a wholly owned subsidiary of The Goodyear Tire & Rubber Company. The Goodyear Tire & Rubber Company controls the global tire design, manufacturing, and marketing strategy implemented by itself and its various subsidiaries, including Goodyear Canada Inc. In particular, it is believed that The Goodyear Tire & Rubber Company implemented and approved the design of the subject P265/70R17 Goodyear tire that is the subject of this action and which was manufactured in a Goodyear Canada Inc. manufacturing facility.

12. The Goodyear Tire & Rubber Company and Goodyear Canada Inc. may hereinafter collectively be referred to as "Goodyear."

13. At all relevant times, Defendant TRW VEHICLE SAFETY SYSTEMS INC. was and is a Delaware corporation with its principal place of business located in Michigan, and which does business in Idaho and directly and through others distributes, markets, and sells its products in Idaho, including the restraint systems in the subject Ford Expedition being used by the Plaintiffs at the time of the March 16, 2024 rollover crash.

14. At all relevant times, Defendant TRW AUTOMOTIVE INC. was and is a Delaware corporation with its principal place of business believed to be in Michigan, and which does business in Idaho and directly and through others distributes, markets, and sells its products in Idaho, including the restraint systems in the subject Ford Expedition being used by the Plaintiffs at the time of the March 16, 2024 rollover crash.

15. Defendant ZF FRIEDRICHSHAFEN AG is a German corporation with its principal place of business located in Germany. Defendant ZF FRIEDRICHSHAFEN AG,

although a German corporation, conducts business in Idaho by targeting, directing, distributing, marketing, and/or selling its products in Idaho. ZF FRIEDRICHSHAFEN AG can be served with process at its headquarters location in Germany.

16.    Defendant ZF ACTIVE SAFETY AND ELECTRONICS US LLC is a Delaware limited liability company with its principal place of business in Michigan and which does business in Idaho.  It is believed that ZF ACTIVE SAFETY AND ELECTRONICS US LLC is a wholly owned subsidiary of Defendant ZF FRIEDRICHSHAFEN AG and that Defendant ZF FRIEDRICHSHAFEN AG is the only member of Defendant ZF ACTIVE SAFETY AND ELECTRONICS US LLC. ZF ACTIVE SAFETY AND ELECTRONICS US LLC can be served with process through its registered agent, Corporation Service company, 251 Little Falls Drive, Wilmington, DE 19808.

17.    Defendant ZF PASSIVE SAFETY SYSTEMS US LLC is a Delaware limited liability company with its principal place of business in Michigan and which does business in Idaho. It is believed that ZF PASSIVE SAFETY SYSTEMS US LLC is a wholly owned subsidiary of Defendant ZF FRIEDRICHSHAFEN AG and that Defendant ZF FRIEDRICHSHAFEN AG is the only member of Defendant ZF PASSIVE SAFETY SYSTEMS US LLC.  ZF PASSIVE SAFETY SYSTEMS US LLC can be served with process through its registered agent,  Corporation Service company, 251 Little Falls Drive, Wilmington, DE 19808.

18.    Defendant ZF TRW AUTOMOTIVE HOLDINGS CORP. is a Delaware corporation with its principal place of business in Michigan and which does business in Idaho. ZF TRW AUTOMOTIVE HOLDINGS CORP. can be served with process through its registered agent, Corporation Service company, 251 Little Falls Drive, Wilmington, DE 19808.

6

19.    ZF NORTH AMERICA, INC. is a Delaware corporation with its principal place of business in Michigan and which does business in Idaho.  ZF NORTH AMERICA, INC. can be served with process through its registered agent, Corporation Service company, 251 Little Falls Drive, Wilmington, DE 1980.

20.    ZF ACTIVE SAFETY US INC. is a Delaware corporation with its principal place of business in Michigan and which does business in Idaho. ZF ACTIVE SAFETY US INC. can be served with process through its registered agent, Corporation Service company, 251 Little Falls Drive, Wilmington, DE 1980.

21.    Defendants TRW VEHICLE SAFETY SYSTEMS INC. and TRW AUTOMOTIVE INC. are believed to have been merged into and/or may now be known as one or more of the following "ZF" Defendants: ZF FRIEDRICHSHAFEN AG, ZF ACTIVE SAFETY AND ELECTRONICS US LLC, ZF PASSIVE SAFETY SYSTEMS US LLC, ZF TRW AUTOMOTIVE HOLDINGS CORP., ZF NORTH AMERICA, INC., and/or ZF ACTIVE SAFETY US INC., one or more of which assumed the liabilities of TRW VEHICLE SAFETY SYSTEMS INC. and TRW AUTOMOTIVE INC.

22.    Defendants TRW VEHICLE SAFETY SYSTEMS INC., TRW AUTOMOTIVE INC., ZF FRIEDRICHSHAFEN AG, ZF ACTIVE SAFETY AND ELECTRONICS US LLC, ZF PASSIVE SAFETY SYSTEMS US LLC, ZF TRW AUTOMOTIVE HOLDINGS CORP., ZF NORTH AMERICA, INC.,  and ZF ACTIVE SAFETY US INC. may be collectively referred to herein as "ZF" or "the ZF Defendants."

23.    Ford researched, developed, designed, tested (or failed to test), manufactured, assembled, marketed, distributed, and sold the subject 2003 Expedition, believed to bear VIN

number 1FMPU16L13LB57903, in which the Plaintiffs were riding at the time of the subject collision ("the Expedition").

24. The ZF Defendants developed, designed, tested (or failed to test), manufactured, assembled, marketed, distributed, and sold the seatbelt systems in the 2003 Expedition in which the Plaintiffs were riding at the time of the subject collision ("the Seatbelt Systems").

25. Goodyear developed, designed, tested (or failed to test), manufactured, assembled, marketed, distributed, and sold the right rear Goodyear tire, believed to bear DOT number 4BT6 BYER 3217 that was on the subject 2003 Expedition in which the Plaintiffs were riding at the time of the subject collision, and which failed immediately before the collision ("the Tire" or "the subject Tire").

**JURJSDICTION AND VENUE**

26. This Court has personal jurisdiction over the Defendants because Defendants have transacted and continue to transact business in Idaho, and because Defendants have committed the acts and omissions complained of herein in the State of Idaho.

27. Plaintiffs each claim damages in excess of $75,000 in this action, excluding costs and interest.

28. This Court is vested with jurisdiction of this action by the diversity statute, 28 U.S.C. § 1332.

29. This Court is vested with venue of this accident because a substantial portion of the events or omissions giving rise to the claim occurred in this judicial district, making venue appropriate pursuant to 28 U.S.C. § 1391(b).

30. At all relevant times, the ZF Defendants purposefully availed themselves of the privileges and benefits of doing business in Idaho, actively, both directly and through agents and/or

franchisees, by, inter alia, distributing, marketing, and selling their components in Idaho, including replacement parts and warranty parts; maintaining ongoing and contractual warranty repair and regulatory responsibilities with respect to components that would be and actually were sold and/or used in Idaho; maintaining and conducting active parts distribution networks and operations extending into Idaho; marketing and selling defective products for popular and common vehicles sold in Idaho and that would be used in Idaho; marketing and selling their products to the largest vehicle manufacturers in the world with the specific knowledge, purpose, and intention that their products would be included in vehicles that would be sold and used nationwide, including in Idaho, and including the subject Expedition and its components; and utilizing courts in Idaho to prosecute and defend actions.

31.    At all relevant times, the ZF Defendants sold and placed the Seatbelt Systems into the stream of commerce with the expectation that they would be purchased and/or used by consumers in Idaho and/or incorporated into vehicles that would be sold in Idaho and used in Idaho.

32.    ZF intentionally targets the Idaho market for the sale of its seatbelts, including in Ford Expedition vehicles and including the subject vehicle.

33.    ZF routinely places its products into the stream of commerce with the knowledge, expectation and intent that they will be sold nationwide, including in Idaho.

34.    ZF knows its products will reach Idaho and intends for its products to reach and to be purchased and used in Idaho.

35.    ZF knew its seatbelts would reach Idaho and intentionally targeted such products at the Idaho market through its network of customers, including Ford.

36.     At all relevant times, the Goodyear Defendants purposefully availed themselves of the privileges and benefits of doing business in Idaho, actively, both directly and through agents and/or franchisees, by, inter alia, distributing, marketing, and selling their tires in Idaho; maintaining ongoing and contractual responsibilities with respect to tires that would be sold and/or used in Idaho; marketing and selling defective tires for popular and common vehicles that Goodyear knew would be and were actually sold and used in Idaho, including the subject Expedition; marketing and selling their tires to the largest vehicle manufacturers in the world with the specific knowledge, purpose, and intention that their products be included in vehicles that would be sold nationwide, including in Idaho; and utilizing courts in Idaho to prosecute and defend actions.

37.     At all relevant times, the Goodyear Defendants sold and placed the subject tire and similar tires into the stream of commerce with the expectation that they would be purchased and/or used by consumers in Idaho and/or incorporated into vehicles that would be sold in Idaho and used in Idaho.

38.     Goodyear intentionally targets the Idaho market for the sale of its tires.

39.     Goodyear routinely places its products into the stream of commerce with the knowledge, expectation, and intent that they will be sold nationwide, including in Idaho.

40.     Goodyear knows its products will reach Idaho and intends for its products to reach and to be purchased and used in Idaho.

41.     Goodyear knew its tires would reach Idaho and intentionally targeted such products at the Idaho market through its network of customers and dealerships.

42.     Goodyear provides warranties for its tires that are sold and/or used in Idaho.

43.     The subject Ford Expedition containing the Seatbelt Systems and the Tire was sold to the Plaintiffs in Idaho.

44.     Ford intentionally targets the Idaho market for the sale of Ford vehicles, including Ford Expedition vehicles and including the subject vehicle.

45.     Defendant Ford intentionally and purposefully uses numerous authorized Ford dealerships throughout the U.S. and Idaho to target the U.S. market, including Idaho, with the sale of Ford vehicles, including Ford Expedition vehicles.

46.     Ford routinely places its Ford Expedition vehicles and other Ford vehicles into the stream of commerce in Idaho.

47.     Ford routinely places its Ford Expedition vehicles and other Ford vehicles into the stream of commerce in Idaho with the intent and expectation that those vehicles will be purchased and used in Idaho.

48.     Ford knew its Ford Expedition and other vehicles will reach Idaho and intend for the vehicles to reach and to be purchased and used in Idaho.

49.     Ford knows its Ford Expedition and other vehicles will and actually do reach Idaho and intentionally targets such vehicles at the Idaho market through its network of Ford dealerships throughout Idaho, and through marketing, sales, warranty, and similar activities including through said dealerships.

50.     ZF, Ford, and Goodyear each intentionally serve the Idaho vehicle market.

51.     ZF, Ford, and Goodyear each conduct business in and/or purposefully directed at Idaho.

52.     Ford is believed to have employees who live in Idaho and/or own or lease real property and personal property in Idaho.

11

53.     Ford has numerous authorized Ford dealerships in Idaho that sell Ford Expedition and other Ford vehicles directly to Idaho customers. Ford and the other Ford Defendants purposefully utilize these dealerships to market to, target, and sell their vehicles to the Idaho market. As such, Ford purposefully avails itself of the privilege of conducting business in Idaho.

54.     Ford advertises its vehicles, including Ford Expedition vehicles, in Idaho.

55.     Ford provides warranties for its vehicles in Idaho and routinely services, maintains, and repairs its vehicles in Idaho utilizing its network of established and authorized dealerships.

### ALLEGATIONS COMMON TO ALL COUNTS

56.     On or about March 16, 2024, Plaintiffs were the properly seatbelted occupants in a model year 2003 Ford Expedition, believed to bear Vehicle Identification Number 1FMPU16L13LB57903, that was Westbound on Interstate 84 in or near Mountain Home, Idaho. At a point near mile post 82.8, the tire tread on the Expedition's right rear Goodyear tire separated, causing the Expedition to lose control and leave the north side of the highway where it rolled over.

57.     Despite being properly seat belted, Plaintiff Ann Morales, who was seatbelted in the Expedition's passenger side middle row seating position, and Plaintiff A.M., who was seatbelted in the Expedition's driver's side third row seating position, were ejected from the vehicle and suffered catastrophic and permanently disabling injuries.

58.     Despite also being properly seatbelted, S.A.M., who was seatbelted in the Expedition's passenger side third row seating position, was partially ejected from the Expedition during the rollover and suffered fatal injuries.

59.     Despite also being properly seatbelted, Plaintiff Steven Morales, who was seated in the driver's seating position, Plaintiff Brandi Morales, who was seated in the front passenger

seating position, and Plaintiff S.M., who was seated in the driver's side middle row seating position, also suffered injuries during the rollover.

60.    Plaintiffs, all of whom were properly seat belted, suffered injuries during the collision due to defects in and negligent design and/or manufacture, testing, marketing, and selling of at least three products: (1) the Expedition ("the Expedition"), (2) the Expedition's seatbelt systems ("the Seatbelt Systems"), and (3) the Expedition's right rear tire ("the Tire"). Plaintiffs allege that these three separate products, two of which (the Seatbelt Systems and the Tire) were incorporated into and sold with the other (the Expedition), were each defective and were each a cause of Plaintiffs' injuries.

61.    S.A.M., who was also properly seatbelted, suffered fatal injuries during the rollover collision due to defects in and negligent design and/or manufacture, testing, marketing and selling of the Expedition, the Seatbelt Systems, and the Tire.

62.    Plaintiffs each suffered injuries and enhanced injuries and incurred damages, as a result of defects in the three products, the Expedition, the Seatbelt Systems, and the Tire.

63.    Plaintiff Steven Morales, who was seatbelted in the driver's seat at the time of the tread separation and resulting rollover, was operating the Expedition and using the Expedition, the Expedition's seatbelt system, and the Tire in a foreseeable and expected manner at the time of the tread separation and rollover.

64.    Plaintiffs Brandi Morales, A.M., Ann Morales, and S.M. and Plaintiffs' decedent S.A.M., who were properly seatbelted in the Expedition's passenger seats, were using the Expedition and its seatbelt systems in a foreseeable and expected manner at the time of the tread separation and rollover.

65.     The Expedition lacked reasonable rollover crashworthiness protections sufficient to provide reasonable protection to occupants in a foreseeable rollover.

66.     The Seatbelt Systems failed to provide adequate occupant restraint and protection to Ann Morales and A.M. who were each ejected and suffered catastrophic injuries despite being properly seat belted at the time of the accident.

67.     The Seatbelt Systems failed to provide adequate occupant restraint and protection to S.A.M. who was partially ejected and suffered fatal injuries despite being properly seat belted at the time of the accident.

68.     The Seatbelt Systems failed to provide adequate occupant restraint and protection to Steven Morales, Brandi Morales, and S.M., who suffered injuries despite being properly seat belted at the time of the accident.

69.     The Tire, a Goodyear Wrangler P265/70R17 113S believed to bear DOT number 4BT6 BYER 3217, suffered a tread separation and catastrophically failed at a point near mile post 82.8, causing the Expedition to lose control, leave the paved roadway, and roll over.

70.     As a direct and proximate result of the negligent and unlawful conduct of the Defendants, and of defects with the Expedition, the Seatbelt Systems, and the Tire, described elsewhere herein, Plaintiffs suffered serious injuries, damages, and losses, described elsewhere herein, including but not limited to general and special damages, economic damages both past and future, and non-economic damages both past and future.

71.     The Expedition and the Seatbelt Systems each had a useful safe life of more than ten years after the time of their delivery to a purchaser or lessee who was not engaged in the business of selling such products or using them as component parts of another product to be sold.

72. Both the Expedition and the Seatbelt Systems were designed, manufactured, marketed, distributed, and sold by their respective manufacturers to have a useful safe life well in excess of ten years and were each intended by their manufacturers to have a useful safe life well in excess of ten years.

73. Both the Expedition and the Seatbelt Systems would normally be likely to perform in a safe manner for more than ten years after the time of their delivery to a purchase or lessee who was not engaged in the business of selling such products or using them as component parts of another product to be sold and would be expected by consumers and users to be likely to perform in a safe manner for more than that ten year period.

74. Particularly, the Expedition and the Seatbelt Systems were such that, absent the rollover collision discussed herein, they would normally be likely to perform in a safe manner for a period extending to and through the date of the subject accident or well in excess of ten years.

75. Additionally, both the subject Expedition and the Seatbelt Systems were regularly inspected and maintained by or on behalf of the owners and users of the products, including the Plaintiffs, from the time of the products' initial delivery until the date of the subject accident, and were found to be in good in working order and free of apparent or obvious defects during such inspections as occurred during that time period.

76. Alternatively, the injury-causing aspects of the Expedition and of the Seatbelt Systems that existed at the time of delivery of those products were not discoverable by an ordinary reasonably prudent person until more than ten years after the time of delivery.

77. Specifically, the injury-causing aspects of the Expedition and of the Seatbelt Systems were latent and were not discoverable by an ordinarily prudent person until after a rollover

accident occurred involving the subject Expedition in which occupants were wearing the Seatbelt Systems.

78.     Certain of the allegations herein have been made and/or may be perceived to have been made in the alternative. Plaintiffs will elect which claims and allegations they intend to pursue before the time of trial.

**COUNTS AGAINST FORD**

**FIRST CAUSE OF ACTION**

**(Strict Products Liability – Ford)**

79.     Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if set forth fully herein.

80.     At all relevant times, Ford was and is engaged in the business of designing, testing, approving, manufacturing, marketing, distributing, and selling motor vehicles, including the subject Expedition, for use in Idaho and elsewhere throughout the United States.

81.     Ford designed, manufactured, tested (and failed to adequately test), distributed, marketed, and sold the Expedition, placing it into the stream of commerce.

82.     At the time the Expedition left the control of and was sold by Ford, it was defective and unreasonably dangerous to persons who might reasonably be expected to use or be affected by the Expedition. These defects include, but are not limited to, the specific conditions described elsewhere herein.

83.     The Expedition was not crashworthy in design and manufacture. Specifically, the Expedition lacked adequate safety features to protect occupants involved in foreseeable rollover collisions.

84.     The Expedition lacked adequate rollover crashworthiness protections.

85.     The Expedition's Seatbelt Systems, including the Seatbelt Systems being used by the Plaintiffs in the front, middle and rear seats, were inadequate to properly restrain the occupants, to properly protect them, prevent them from suffering injury, and prevent them from becoming unrestrained and ejected in foreseeable rollover collisions. Particularly, the Seatbelt Systems failed and resulted in multiple ejections and a partial ejection in the subject accident as follows:

a.  The Expedition's seatbelt system located at the passenger side middle row seating position failed during the subject collision, resulting in Ann Morales becoming unrestrained, getting ejected from the vehicle, and suffering catastrophic injuries.

b.  The Expedition's seatbelt system located at the driver's side third row seating position failed during the subject collision, resulting in A.M. becoming unrestrained, getting ejected from the vehicle, and suffering catastrophic injuries.

c.  The Ford Expedition's seatbelt system located at the passenger side third row seating position failed during the subject collision, resulting in S.A.M. becoming effectively unrestrained, getting partially ejected from the vehicle, and suffering fatal injuries.

86.     The Expedition's Seatbelt Systems, including all of their components such as the belt webbing, buckle and stalk, retractors, anchors, and anchor points, as well as the overall design and geometry of the system, were inadequate to reasonably restrain and protect occupants when exposed to foreseeable crash forces in rollovers.

87.     The Expedition's Seatbelt Systems were unreasonably susceptible to failure, including but not limited to failure to properly and timely lock and excessive webbing payout.

88.     The Expedition's seat belt systems lacked excursion-mitigating and slack-mitigating  devices, such as web clamps, pretensioners, seat-integrated belts, and other similar

devices which can prevent or limit excursion of occupants, minimize slack and webbing payout, and prevent full and partial ejections during rollover collisions. The Expedition lacked such excursion-mitigating and slack-mitigating devices even though Ford was aware of these and other technologies which could better keep occupants safely in place during rollover collisions, and despite the fact that it would have been practical and relatively inexpensive for Ford to use such devices and designs in the Expedition's seat belt systems.

89.    The Expedition's door latch system, including its components, was inadequate to assure that the doors remained closed during foreseeable rollover collisions.

90.    The Expedition's side windows were inadequate to reasonably protect occupants during rollover accidents. Particularly, the tempered glass used in the Expedition's side windows was designed and manufactured so as to shatter and break out when subjected to foreseeable crash forces, including forces sustained during rollover. In the subject accident, the tempered side window glass shattered, opening up portals through which occupants were ejected or partially ejected.

91.    The Expedition lacked electronic stability control, or similar such technology by another name, that is specifically and expressly intended to prevent the loss of control that occurred with the Expedition on the paved roadway, and that would have mitigated and/or prevented the loss of control experienced by the Expedition after the right rear Tire failed and suffered a tread separation. The lack of electronic stability control was therefore a cause of the subject collision.

92.    The Expedition lacked electronic stability control even though it was known to be a proven and effective safety feature and was cost effective and available at the time that the Expedition was marketed and sold.

93. The Expedition lacked adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the vehicle and reasonable means to reduce such risks, dangers, and harms.

94. In particular, the Expedition lacked a warning that it was not equipped with electronic stability control that was included as an optional or standard safety feature in other comparable vehicles during the same time frame and a warning that the absence of electronic stability control made the Expedition likely to lose control and be involved in collisions that otherwise would have been prevented by electronic stability control.

95. The Expedition's lack of adequate rollover crashworthiness protections magnified the risks posed by its lack of electronic stability control. The lack of electronic stability control made it more likely that Expeditions would be involved in rollover collisions in which occupants would be subjected to unacceptable and preventable risks of serious injuries due to the vehicle's lack of rollover crashworthiness protections.

96. The Expedition's Seatbelt Systems were designed such that they were unreasonably susceptible to or prone to failing to properly lock, experiencing excessive webbing payout, or otherwise failing during foreseeable rollover collisions.

97. The Expedition lacked alternative designs that were feasible and that could have provided better protection to occupants during rollover collisions, including but not limited to alternative restraint system designs, rollover activated pretensioners, rollover activated side curtain airbags, alternative glass designs, and a suitable, appropriate "friendly interior."

98. The Expedition's design failed to integrate its various components such as the roof and supporting structures, seat belt systems, seats and related components, interior, glazing, and occupant compartment structure in such a way that would reasonably protect occupants in rollover

collisions. This was despite the fact that Ford was aware that these systems needed to be designed to work together to protect occupants in rollover collisions.

99. The Expedition was expected to reach the user or consumer without substantial change in the condition in which it was sold and it did in fact reach the Morales family without substantial change in the condition in which it was sold.

100. At the time of the subject collision, the subject Expedition was being used in a manner and a fashion that was foreseeable to Ford and in a manner in which it was intended to be used.

101. Ford placed the subject Expedition into the stream of commerce knowing that it would be used without inspection for defects.

102. Because of the defective design, manufacture, assembly, and distribution of the aforementioned aspects, components, and systems of the subject Expedition, the vehicle was unsafe in a foreseeable collision and, as a result, was unreasonably dangerous and should not have been placed into the stream of commerce.

103. Plaintiffs Steven Morales, Brandi Morales, Ann Morales, S.M., and A.M., and their decedent, S.A.M., were each persons who would reasonably be expected to use the subject Expedition.

104. It was foreseeable to Ford that the Expedition could and would be involved in rollover collisions as occurred in the subject collision.

105. It was foreseeable to Ford that the Expedition could and would experience tire tread separations that could lead to a loss of control and to rollovers.

106. Defects in the subject Expedition and/or in its systems or components were a proximate cause of the Plaintiffs' injuries and damages.  In particular, the defects in the Expedition

20

caused enhanced physical injuries to Plaintiffs that were over and above those injuries that would likely have resulted from the subject collision in the absence of the defects.

107. Additionally, the defects in the Expedition caused the wrongful death of S.A.M. and the resulting injuries, damages, and losses suffered by the Plaintiffs as a result of the death of S.A.M.

108. Ford is strictly liable to the Plaintiffs for injuries and damages caused by defects and inadequacies in the design, manufacture, and warnings of the subject Expedition.

109. As a direct and proximate result of the aforesaid defective and unreasonably dangerous condition of the Expedition, Plaintiffs suffered serious injuries and damages.

WHEREFORE, Plaintiffs pray for an award of damages against Ford to be fixed by the trier of fact in a reasonable amount.

## SECOND CAUSE OF ACTION

### (Negligence – Ford)

110. Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if set forth fully herein.

111. Ford had a duty to design the Expedition so that occupants would be provided reasonable protection in the event of foreseeable collisions, including rollovers.

112. Ford was negligent in failing to exercise reasonable care to prevent the Expedition from creating an unreasonable risk of harm to persons who might reasonably be expected to use or be affected by the Expedition while it was being used in a manner Ford might reasonably have expected.

113. Plaintiffs were each in that class of persons whom Ford should reasonably have expected to use or be affected by the Expedition.

21

114.   Ford was negligent in failing to exercise reasonable care to warn users of the Expedition of the risks of harm associated with foreseeable use of the vehicle.

115.   At all relevant times, Ford had a duty to design and manufacture a vehicle that would provide reasonable protection to front, middle, and rear seat occupants in the event of foreseeable collisions, including rollovers.

116.   At all relevant times, Ford had a duty to design and manufacture a vehicle that did not subject middle and rear seat occupants to unreasonable risks of becoming unrestrained and getting ejected during foreseeable collisions, including rollovers. In particular, Ford had a duty to design its vehicles such that the various components worked in conjunction with one another to provide adequate crash protection to occupants and to minimize the risks of occupants becoming unrestrained and getting ejected or partially ejected in foreseeable collisions, including rollovers.

117.   At all relevant times, Ford had a duty to design and manufacture a vehicle that did not subject occupants to unreasonable risks of harm during reasonably foreseeable use of the vehicle and its systems and components.

118.   At all relevant times, Ford negligently designed, tested (or failed to adequately test), manufactured, assembled, marketed, distributed, sold, and supplied the subject Expedition in that it failed to exercise reasonable care to prevent the subject Expedition and its components from creating an unreasonable risk of harm to a person who might reasonably be expected to use them in an expected or reasonably foreseeable manner. Ford thereby breached its various duties set forth in this Count and elsewhere in this Complaint.

119.   Ford knew or should have known that the Seatbelt Systems in the Expedition were incapable of providing adequate restraint to occupants and were unreasonably susceptible to improper locking, late or nonexistent locking, excessive webbing payout, slack formation, and

otherwise failing in foreseeable collisions, including rollovers. Ford nevertheless sold the Expedition with these deficient and defective Seatbelt Systems.

120. Ford knew or should have known that electronic stability control would have avoided and mitigated the loss of control leading to the subject accident, but Ford nonetheless sold the Expedition without electronic stability control.

121. Ford designed and manufactured the Expedition with inadequate rollover crashworthiness.

122. Ford knew that its Ford Expedition vehicles would experience tire failure in real world accidents and that such tire failure would lead to rollovers, but Ford nonetheless designed the Expedition without adequate rollover crashworthiness protections.

123. Ford is believed to have taken the actions alleged herein, in whole or in part, to increase profits.

124. Ford's acts of negligence include the acts alleged elsewhere in this Count and in this Complaint and include but are not limited to the following:

    a. Ford engaged in inadequate rollover crashworthiness testing of its Expedition and similar vehicles.

    b. Ford failed to provide reasonable rollover crashworthiness protections in the subject Expedition.

    c. Ford failed to design the Expedition such that its overall packaging would provide reasonable occupant protection and prevent occupants from becoming unrestrained and getting ejected and seriously injured or killed in rollover collisions.

    d. Ford equipped the Expedition with Seatbelt Systems that were insufficient to adequately restrain and protect occupants during foreseeable rollover collisions.

Multiple Seatbelt Systems in the Expedition failed during the subject collision, causing two complete ejections and catastrophic injuries and causing one partial ejection and fatal injuries.

e. Ford provided Seatbelt Systems that were unreasonably susceptible to failures and malfunctions during foreseeable collisions including failures involving the retractor, locking mechanism, webbing, and/or buckle.

f. Ford failed to provide Seatbelt Systems that would properly lock, minimize slack, and provide effective restraint during rollover collisions.

g. At the time it designed, manufactured, and sold the subject Expedition, Ford knew or should have known of safer alternative designs for the vehicle including safer alternative designs for the Seatbelt Systems, which would have prevented occupants from becoming unrestrained and ejected or partially ejected.

h. Ford knowingly failed to incorporate into the Expedition other designs and technologies that could protect occupants from foreseeable crash forces in rollover accidents.

i. Ford knew that the primary purpose of a seatbelt is to lock in a timely and proper manner, minimize slack, and restrain the occupant, but Ford nonetheless distributed, marketed, and sold the subject Expedition with Restraint Systems that were incapable of meeting these basic objectives.

j. Ford failed to design the Expedition with appropriate ejection mitigation features, including laminated side window glass and rollover-activated side curtain airbags, even though this technology was feasible, cost effective, and readily available.

24

k. Ford failed to design the roof structures, the seating systems and their components, the restraint systems and their components, and the other components of the vehicle to work in harmony and to prevent and to minimize the potential for the restrain systems to fail and cause catastrophic injuries during foreseeable rollovers.

l. Ford failed to provide adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the Expedition and reasonable means to reduce or avoid such risks, dangers, and harms.

m. Ford knew the defects in the Expedition discussed throughout this Complaint were present and were resulting in deaths and serious injuries prior to the accident involving the Plaintiffs. Ford's knowledge, in part, came from numerous other reports of Expedition rollovers resulting in injuries and deaths, including numerous lawsuits alleging defects similar if not identical to those alleged herein many years before the subject accident. Despite this knowledge, Ford did nothing to warn the Plaintiffs or others and took no actions to prevent the harms and injuries suffered by Plaintiffs, including recalling the Expedition due to these defects.

n. Ford knew from its own long and extensive history of crash testing on vehicles containing laminated side windows that laminated glass prevents and mitigates ejections and partial ejections, yet Ford chose not to incorporate laminated glass in the subject Expedition.

o. Ford engaged in such other and further acts and omissions constituting negligence as may be revealed in discovery.

125. Ford's knowledge as described in this Complaint is believed to be reflected in internal Ford communications, including memoranda and e-mail.

126.    Ford's  knowledge as described in this Complaint is believed to be reflected in reports of other incidents involving Ford vehicles.

127.    Ford's knowledge as described in this Complaint is believed to be reflected in Ford's compilations and analyses of accident data.

128.    Ford's knowledge as described in this Complaint is believed to be reflected in results of tests conducted by Ford and others.

129.    In designing, manufacturing, failing to adequately test, assembling, distributing, marketing, and selling the subject Expedition and its systems and components, including the Seatbelt Systems, as described elsewhere herein, Ford engaged in willful, wanton, and reckless misconduct as those terms are defined in law insofar as it knew or should have known that its actions described herein not only created an unreasonable risk of harm to others (namely, consumers and users of the Expedition and its systems and components, including the Seatbelt Systems) but involved a high degree of probability that such harm would result, including in rollover collisions like the collision at issue in this case.

130.    As a direct and proximate result of the negligent and unlawful conduct of Ford described herein, Plaintiffs incurred substantial injuries damages, which are set forth elsewhere herein.

131.    Ford's negligent and unlawful conduct was a proximate cause of the serious personal injuries and resulting damages to Plaintiffs.

132.    Ford's negligent and unlawful conduct was a proximate cause of the wrongful death of S.A.M. and of Plaintiffs' injuries, damages, and losses resulting from his death.

WHEREFORE, Plaintiffs pray for an award of damages against Ford to be fixed by the trier of fact in a reasonable amount.

26

**THIRD CAUSE OF ACTION**

**(Breach of Express and Implied Warranties – Ford)**

133.    Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if set forth fully herein.

134.    At all relevant times, Ford knew the particular purposes for which the Expedition and its components were required and were to be used, and that purchasers and users such as occupants of the Expedition would rely on Ford's skill and judgment in designing, testing, manufacturing, distributing, furnishing, and selling goods that were suitable for such purposes.

135.    The Expedition and its component systems and parts were not free from defects or fit for the purpose for which they were to be used and were, in fact, defectively designed, manufactured, and distributed and imminently dangerous to occupants and users and, in fact, did cause serious and permanent injuries to the occupants and users thereof while being used for their intended purpose in a manner reasonably foreseeable to Ford. As a result, the subject Expedition was unsafe and dangerous for use by the consumer and in particular by the Expedition occupants, the five named Plaintiffs and the other members of the Morales family.

136.    Ford expressly and impliedly warranted to foreseeable purchasers and users of the subject Expedition, including the general public and Plaintiffs, that their products, including the subject Expedition and its components, were suitable for their intended use, were of merchantable quality, and had no substantial risk of sudden failure. In particular, Ford expressly warranted that the Ford's seatbelt systems, including the Seatbelt Systems, would restrain and provide protection to occupants during foreseeable, real world collisions, including rollovers.  This warranty was not limited by time and extended to future performance of the Seatbelt Systems.

27

137. The subject Expedition was defective and was not of merchantable quality and was not fit for its intended purpose in that component parts thereof were capable of causing and, in fact, did cause serious and catastrophic permanent injuries to users and consumers thereof, including Plaintiffs, while being used in a manner reasonably foreseeable to Ford.

138. Ford chose and selected all the components and parts for the Expedition.

139. Ford knew or should have known of prior claims resulting from the Expedition and its component parts not performing as intended yet still chose to sell the Expedition along with its component parts.

140. The Ford Expedition was unreasonably dangerous in its design, marketing, manufacture, and assembly before it was placed into the stream of commerce and sold to Plaintiffs.

141. Ford knew or should have known that the design, assembly, and/or manufacturing of the subject Expedition were defective and unreasonably dangerous, and that such defects were present at the time the vehicle was manufactured, assembled, distributed, and sold.

142. As a direct and proximate result of Ford's breach of warranties, Plaintiffs suffered serious injuries and past, present, and future special and general damages set forth elsewhere herein and incorporated by this reference.

143. Ford's breach of warranties directly and proximately caused the wrongful death of S.A.M. and Plaintiffs' injuries, damages, and losses resulting from his death.

144. As a direct and proximate result and consequence of each breach of Ford's implied and express warranties as discussed herein, Plaintiffs suffered injuries, damages, and losses more fully described elsewhere herein.

WHEREFORE, Plaintiffs pray for an award of damages against Ford to be fixed by the trier of fact in a reasonable amount.

**COUNTS AGAINST ZF/THE ZF DEFEDANTS**

**FOURTH CAUSE OF ACTION**

**(Strict Liability – ZF/The ZF Defendants)**

145.   Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if set forth fully herein.

146.   At all relevant times, ZF was and is engaged in the business of designing, testing, approving, manufacturing, marketing, distributing, and selling seatbelts and restraint systems, including the Seatbelt Systems, for use in Idaho and elsewhere throughout the United States.

147.   ZF designed, manufactured, tested (and failed to adequately test), distributed, marketed, and sold the Seatbelt Systems, placing them into the stream of commerce.

148.   At the time the Seatbelt Systems left the control of and were sold by ZF, they were defective and unreasonably dangerous to persons who might reasonably be expected to use or be affected by the Seatbelt Systems including in the Expedition. These defects include, but are not limited to, the conditions described in the following paragraphs and elsewhere in this Complaint.

149.   The Seatbelt Systems, including the Seatbelt Systems being used by the Plaintiffs in the front, middle and rear seats, were inadequate to properly restrain the occupants, to properly protect them, to prevent them from suffering injury, and to prevent them from becoming unrestrained and ejected in foreseeable rollover collisions. Particularly, the Seatbelt Systems failed and resulted in multiple ejections and a partial ejection as follows:

    a.   The Seatbelt System located at the passenger side middle row seating position failed during the subject collision, resulting in Ann Morales becoming unrestrained, getting ejected from the vehicle, and suffering catastrophic injuries.

b.  The Seatbelt System located at the driver's side third row seating position failed during the subject collision, resulting in A.M. becoming unrestrained, getting ejected from the vehicle, and suffering catastrophic injuries.

c.  The Seatbelt System located at the passenger side third row seating position failed during the subject collision, resulting in S.A.M. becoming unrestrained, getting partially ejected from the vehicle, and suffering fatal injuries.

150.    The Seatbelt Systems, including all of their components such as the belt webbing, buckle and stalk, retractors, anchors, and anchor points, as well as the overall design and geometry of the system, were inadequate to reasonably restrain and protect vehicle occupants including occupants of the Expedition when exposed to foreseeable crash forces in rollovers.

151.    The Seatbelt Systems were unreasonably susceptible to failure, including but not limited to failure to properly and timely lock, intermittent locking and unlocking, excessive webbing payout and/or seatbelt buckle unlatching.

152.    The Seatbelt Systems lacked excursion-mitigating and slack mitigating devices, such as web clamps and pretensioners and other similar devices which can prevent or limit excursion of vehicle occupants, minimize slack and webbing payout, and prevent full and partial ejections during rollover collisions including rollover collisions involving the Expedition.

153.    The Seatbelt Systems lacked adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the Seatbelt Systems and reasonable means to reduce such risks, dangers, and harms.

154.    The Seatbelt Systems were designed and/or manufactured such that they were unreasonably susceptible to or prone to failing to properly lock, experiencing excessive webbing

30

payout, or otherwise failing during foreseeable rollover collisions including rollover collisions involving the Expedition.

155.    The Seatbelt Systems lacked alternative designs that could have provided better protection to occupants during rollover collisions including rollover collisions involving the Expedition.

156.    The Seatbelt Systems were expected to reach the user or consumer without substantial change in the condition in which they were sold and they did in fact reach the Morales family without substantial change in the condition in which they were sold.

157.    At the time of the subject collision, the subject Seatbelt Systems were being used in a manner and a fashion that was foreseeable to ZF and in a manner in which they were intended to be used.

158.    ZF placed the subject Seatbelt Systems into the stream of commerce knowing that they would be used without inspection for defects.

159.    Because of the defective design, manufacture, assembly, and distribution of the aforementioned aspects and components of the Seatbelt Systems, the Seatbelt Systems were defective and unreasonably dangerous and should not have been placed into the stream of commerce.

160.    Plaintiffs Steven Morales, Brandi Morales, Ann Morales, S.M., and A.M., and their decedent, S.A.M., were each persons who would reasonably be expected to use the Seatbelt Systems.

161.    It was foreseeable to ZF that the Seatbelt Systems would be involved in rollover collisions as occurred in the subject collision.

162.    Defects in the subject Seatbelt Systems and/or in their components were a proximate cause of the Plaintiffs' injuries and damages. In particular, the defects in the Seatbelt Systems caused enhanced physical injuries to Plaintiffs that were over and above those injuries that would likely have resulted from the subject collision in the absence of the defects in the Seatbelt Systems.

163.    Additionally, the defects in the Seatbelt System caused the wrongful death of S.A.M. and the resulting injuries, damages, and losses suffered by the Plaintiffs as a result of the death of S.A.M.

164.    ZF is strictly liable to the Plaintiffs for injuries and damages caused by defects and inadequacies in the design, manufacture, and warnings of the subject Seatbelt Systems, described elsewhere herein.

165.    As a direct and proximate result of the aforesaid defective and unreasonably dangerous condition of the Seatbelt Systems, Plaintiffs suffered serious injuries and damages.

WHEREFORE, Plaintiffs pray for an award of damages against ZF to be fixed by the trier of fact in a reasonable amount.

## FIFTH CAUSE OF ACTION

### (Negligence - Against the ZF Defendants)

166.    Plaintiffs incorporate all allegations made elsewhere in this Complaint.

167.    At all times herein relevant, the ZF Defendants were engaged in the business of designing, manufacturing, testing, selling, and placing into the stream of commerce seatbelt systems, including the Seatbelt Systems in the subject Expedition, throughout the United States and throughout the state of ldaho.

168. The ZF Defendants had a legal duty to conform their conduct in conformance with the law and that of a reasonable corporation, which includes adequately and properly manufacturing, designing, testing and selling their products, including the Seatbelt Systems in the subject Expedition and acting without negligence, conscious disregard, willful, reckless, despicable or other wrongful conduct.

169. The ZF Defendants had a duty to design the Seatbelt Systems to provide reasonable protection to occupants in the event of a rollover collision, such as Expedition occupants involved in an Expedition rollover collision.

170. The ZF Defendants had a duty to design the Seatbelt Systems such that they would properly lock, remain locked and latched, and adequately restrain vehicle occupants during foreseeable collisions including rollover collisions involving the Expedition.

171. The ZF Defendants had a duty to design the Seatbelt Systems such that they would not create an unreasonable risk of harm to vehicle occupants during foreseeable collisions, including rollovers.

172. The ZF Defendants had a duty to design the Seatbelt Systems to provide reasonable protection to vehicle occupants in the event of an accident. In particular, the ZF Defendants had a duty to design seatbelt systems that would properly lock, remain latched, and provide reasonable protection to vehicle occupants during rollover collisions, including rollover collisions involving the Expedition.

173. The ZF Defendants were well aware of the importance from a safety standpoint of containing occupants inside a vehicle during a rollover, and the ZF Defendants were well aware that an ejection significantly increases the chances of suffering serious or fatal injuries in a rollover.

174. The ZF Defendants negligently designed, tested, manufactured, marketed, distributed, sold and supplied the Seatbelt Systems and their components in that they failed to exercise reasonable care to prevent the Seatbelt Systems and their components from creating an unreasonable risk of harm to persons who might reasonably be expected to use them in an expected or reasonably foreseeable manner.

175. The ZF Defendants' acts of negligence include but are not limited to the conditions described in the following paragraphs and elsewhere herein.

176. The ZF Defendants breached their duty to design the Seatbelt Systems to provide reasonable protection to vehicle occupants in collisions, including rollover collisions, and failed to conform their conduct in conformance with the law and that of a reasonable manufacturer, causing the injuries and damages to Plaintiffs.

177. In particular, the ZF Defendants breached their duties to consumers and users of their seat belt and restraint systems by manufacturing, selling and providing seatbelt systems containing retractors that were unreasonably susceptible to improper or intermittent locking and excessive slack and payout during collisions, including rollovers.

178. At the time of their design and manufacture of the Seatbelt Systems included in the subject Expedition, the ZF Defendants were aware or should have been aware of the defects in the Seatbelt Systems but inserted them into the stream of commerce anyway, without seeking to design out the defects, guard against them, or provide any type of reasonable or adequate warnings to consumers such as the Plaintiffs.

179. At the time of the design and manufacture of the Seatbelt Systems included in the subject Expedition, the ZF Defendants were aware or should have been aware of safer alternative

designs that were technologically and economically feasible, but the ZF Defendants chose not to incorporate those alternative designs into the Seatbelt Systems.

180.    At the time of the design and manufacture of the Seatbelt Systems included in the subject Expedition, the ZF Defendants were aware or should have been aware of the susceptibility of the Seatbelt Systems to fail to properly lock, to intermittently lock, to allow for excessive slack or webbing payout, to unlatch and release, and to otherwise fail to properly restrain occupants during accidents, especially rollovers.

181.    At the time of the design and manufacture of the Seatbelt Systems included in the subject Expedition, the ZF Defendants knew that these susceptibilities of the Seatbelt Systems would subject occupants to the risk of catastrophic injuries or death in foreseeable rollover collisions including rollover collisions involving the Expedition.

182.    Specifically, at the time of the design, manufacture and sale of the Seatbelt Systems included in the subject Expedition, the ZF Defendants were aware that the Seatbelt Systems were unduly and unreasonably susceptible to failing to properly lock, to intermittently locking, to permitting excessive slack and webbing payout, and to otherwise failing during rollover accidents.

183.    In fact, long before the subject accident, the ZF Defendants had been put on notice numerous times that the subject Seatbelt Systems and/or similar Seatbelt Systems had failed to properly lock, intermittently unlocked, unlatched, and otherwise failed, causing serious injuries and deaths to American consumers.

184.    This notice included lawsuits filed against the ZF Defendants' OEM customers (like Ford) and against the ZF Defendants themselves on behalf of consumers who were killed or seriously injured when their ZF seatbelts failed to restrain them during accidents, including rollover accidents.

35

185.     It is believed that the ZF Defendants keep track of lawsuits filed against them in product liability actions, and it is expected that the ZF Defendants will readily produce a list of all claims and lawsuits filed long before the subject accident in which it was alleged that death or serious injury occurred to an occupant due to the failure of a ZF seatbelt to provide adequate occupant protection during a rollover. Despite this knowledge of the defects in their Seatbelt Systems, the ZF Defendants did nothing to warn or inform consumers or the National Highway Traffic Safety Administration of safety the risks posed by their products or to recall their defective products.

186.     The ZF Defendants knew or should have known that the Seatbelt Systems posed serious safety risks to potential users, but nonetheless provided the Seatbelt Systems to Ford for inclusion in the Expedition and other vehicles.

187.     The ZF Defendants failed to provide appropriate seat belt systems for the Expedition that would properly restrain and protect occupants during foreseeable collisions.

188.     The ZF Defendants failed to design and manufacture seat belt systems with adequate overall design and geometry.

189.     The ZF Defendants failed to provide seat belt system excursion-mitigating devices, such as web clamps, pretensioners, seat-integrated belts, and other similar devices which can prevent or limit excursion of occupants during rollover collisions.

190.     The ZF Defendants failed to design and manufacture adequately safe seat belt systems for inclusion and use in the Expedition. Particularly, the seat belt systems were inadequate to prevent occupant injuries during foreseeable rollovers given the design of the Expedition's roof, the overall packaging of the vehicle, and the manner in which the Seatbelt Systems were

36

incorporated into the vehicle, all of which were known or should have been known to ZF when it designed, manufactured, and supplied the Seatbelt Systems for inclusion in the vehicle.

191. The ZF Defendants engaged in inadequate testing of the Expedition's Seatbelt Systems.

192. The ZF Defendants failed to provide appropriate seat belt systems for inclusion and use in the Expedition that would adequately restrain and protect occupants during foreseeable collisions including rollover collisions.

193. The ZF Defendants failed to design and manufacture seat belt systems with adequate overall design and geometry.

194. At the time of the design and manufacture of the Seatbelt Systems, the ZF Defendants were aware or should have been aware of the dangers of failure of the Seatbelt Systems to operate properly, and of design characteristics necessary to assure that a vehicle will provide reasonable crash  protection. The ZF Defendants nonetheless failed to adequately design the Seatbelt Systems for inclusion and use in the Expedition.

195. The ZF Defendants' knowledge as described in this Complaint is believed to be reflected in reports of other incidents involving the ZF Defendants' seat belt systems.

196. The ZF Defendants' knowledge as described in this Complaint is believed to be reflected in the ZF Defendants' compilations and analyses of accident data.

197. The ZF Defendants' knowledge as described in this Complaint is believed to be reflected in results of tests conducted by the ZF Defendants and others.

198. The ZF Defendants' knowledge as described in this Complaint is believed to be reflected in the results of other studies and analysis conducted by the ZF Defendants and others,

which may have included other dynamic or static tests, computer simulations, and cost/benefit analyses.

199.    The ZF Defendants breached their duty to design the Seatbelt Systems to provide reasonable protection to vehicle occupants in rollover collisions, such as Expedition occupants involved in Expedition rollover collisions.

200.    The ZF Defendants acted unreasonably in designing, manufacturing, supplying, distributing, and marketing Seatbelt Systems that presented a substantial and unreasonable risk of injury or death to vehicle occupants, including the Plaintiffs and the Plaintiffs' decedent.

201.    In designing, manufacturing, failing to adequately test, assembling, distributing, marketing, and selling the Seatbelt Systems as described elsewhere herein, the ZF Defendants engaged in willful, wanton, and reckless misconduct as those terms are defined in law insofar as they knew or should have known that their actions described herein not only created an unreasonable risk of harm to others (namely, consumers and users of the Seatbelt Systems) but involved a high degree of probability that such harm would result, including in rollover collisions like the collision at issue in this case.

202.    As a direct and proximate result of the negligent and unlawful conduct of ZF described herein, Plaintiffs incurred substantial injuries damages, which are set forth elsewhere herein.

203.    ZF's negligent and unlawful conduct was a proximate cause of the wrongful death of S.A.M. and of Plaintiffs' injuries, damages, and losses resulting from his death.

204.    ZF's negligent and unlawful conduct was a proximate cause of the serious personal injuries and resulting damages to Plaintiffs.

WHEREFORE, Plaintiffs pray for an award of damages against ZF to be fixed by the trier of fact in a reasonable amount.

## SIXTH CAUSE OF ACTION

### (Breach of Express and Implied Warranties – ZF)

205.    Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if set forth fully herein.

206.    At all relevant times, ZF knew the particular purposes for which the Seatbelt Systems and their components were required and were to be used, and that purchasers and users of the Seatbelt Systems, such as occupants of the Expedition, would rely on ZF's skill and judgment in designing, testing, manufacturing, distributing, furnishing, and selling goods that were suitable for such purposes.

207.    The Seatbelt Systems and their component parts were not free from defects or fit for the purpose for which they were to be used and were, in fact, defectively designed, manufactured, and distributed and imminently dangerous to occupants and users and, in fact, did cause serious and permanent injuries to the occupants and users thereof while being used for their intended purpose in a manner reasonably foreseeable to ZF. As a result, the subject Seatbelt Systems were unsafe and dangerous for use by the consumer and in particular by the occupants of the Expedition who were using the Seatbelt Systems at the time of the accident – the six members of the Morales family.

208.    ZF expressly and impliedly warranted to foreseeable purchasers and users of the subject Seatbelt Systems, including the general public and the Plaintiffs, that their products, including the subject Seatbelt Systems and their components, were suitable for their intended use, were of merchantable quality, and had no substantial risk of sudden failure. In particular, ZF

expressly warranted that the ZF's seatbelt systems, including the Seatbelt Systems, would restrain and provide protection to occupants during foreseeable, real world collisions, including rollovers.

209. The subject Seatbelt Systems were defective and were not of merchantable quality and were not fit for their intended purpose in that the Seatbelt Systems were capable of causing and, in fact, did cause serious and catastrophic permanent injuries to users and consumers thereof, including Plaintiffs, while being used in a manner reasonably foreseeable to ZF.

210. ZF chose and selected all the components and parts for the Seatbelt Systems.

211. ZF knew or should have known of prior claims resulting from the Seatbelt Systems and their component parts not performing as intended yet still chose to sell the Seatbelt Systems along with their component parts and chose not to provide warnings or to recall the Seatbelt Systems.

212. The ZF Seatbelt Systems were unreasonably dangerous in their design, marketing, manufacture, and assembly before they were placed into the stream of commerce and sold to Plaintiffs.

213. ZF knew or should have known that the design, assembly, and/or manufacturing of the subject Seatbelt Systems were defective and unreasonably dangerous, and that such defects were present at the time the Seatbelt Systems were manufactured, assembled, distributed, and sold.

214. As a direct and proximate result of ZF's breach of warranties, Plaintiffs suffered serious injuries and past, present, and future special and general damages set forth elsewhere herein and incorporated by this reference.

215. ZF's breach of warranties directly and proximately caused the wrongful death of S.A.M. and Plaintiffs' injuries, damages, and losses resulting from his death.

216.    As a direct and proximate result and consequence of each breach of ZF's implied and express warranties as discussed herein, Plaintiffs suffered injuries, damages, and losses more fully described elsewhere herein.

WHEREFORE, Plaintiffs pray for an award of damages against ZF to be fixed by the trier of fact in a reasonable amount.

## COUNTS AGAINST GOODYEAR

### SEVENTH CAUSE OF ACTION
### (Strict Liability – Goodyear)

217.    Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if set forth fully herein.

218.    At all relevant times, Goodyear was and is engaged in the business of designing, testing, approving, manufacturing, marketing, distributing, and selling tires for use in Idaho and elsewhere throughout the United States.

219.    Goodyear designed, manufactured, tested (and failed to adequately test), distributed, marketed, and sold the Tire, placing it into the stream of commerce.

220.    At the time the Tire left the control of and was sold by Goodyear, it was defective and unreasonably dangerous to persons who might reasonably be expected to use or be affected by the Tire. The Tire contained both design and manufacturing defects that caused it to fail on the date of the subject accident. These design and manufacturing defects include, but are not limited to, the conditions described in the following paragraphs and elsewhere in this Complaint.

221.    The Tire was designed without a critical safety feature. The tire lacked belt edge reinforcement, such as a nylon overlay, that would prevent a tread separation. A nylon overlay, also referred to as a nylon cap ply, covers the steel belts, providing stability and durability, and acts to prevent and retard the pulling apart or the separation of steel belts that results in a tread

41

separation. A nylon overlay would have substantially improved the separation resistance of this type of Tire and would have prevented and avoided the tread separation that caused the subject accident.

222.    The Tire also lacked other types of suitable belt edge reinforcements, such as Kevlar overlays used by Goodyear in some of its tires years before it manufactured the subject Tire without any belt edge reinforcement whatsoever.

223.    The Tire also had a deficient inner liner. One of the critical structures of a tire is the inner liner, whose purpose is to retain the air in the tire. The inner liner of the subject Tire was too thin, which reduced the Tire's ability to hold in pressure. The unreasonably thin inner liner made it unduly permeable to inflation pressure, leading to premature deterioration of the rubber and making the tire unreasonably susceptible to failure. This thin inner liner was reflective of a design and/or manufacturing defect of the Tire.

224.    The Tire also suffered from manufacturing defects resulting in numerous areas of poor adhesion between the tire components. This poor adhesion between the Tire's components made the Tire unreasonably susceptible to failure, including tread separation.

225.    Because of its design and manufacturing defects, the Expedition's Tire was unreasonably susceptible to failure, including the tread separation that caused the loss of control and ensuring rollover crash involving the Expedition.

226.    The Tire lacked adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the Tire and reasonable means to reduce such risks, dangers, and harms.

227.    The Tire was designed and manufactured such that it was unreasonably susceptible to suffering a tread separation under normal and foreseeable driving conditions.

228.    The Tire lacked feasible alternative designs that could have provided better protection to occupants using and relying upon the tire. Safer alternative designs that could have been utilized by Goodyear in the Tire included a nylon overlay and a thicker, more robust inner liner, each of which would have prevented and avoided the tread separation that occurred here.

229.    The Tire was expected to reach the user or consumer without substantial change in the condition in which it was sold and it did in fact reach the Morales family without substantial change in the condition in which it was sold.

230.    At the time of the subject collision, the subject Tire were being used in a manner and a fashion that was foreseeable to Goodyear and in a manner in which it was intended by Goodyear to be used.

231.    Goodyear placed the subject Tire into the stream of commerce knowing that it would be used without inspection for defects and knowing that the design defects here, including the lack of a nylon overlay and a thin inner liner, were "hidden" defects that would not be known or evident to and could not be discovered by a reasonable consumer.

232.    Because of the defective design and manufacture of the Tire, the Tire was defective and unreasonably dangerous and should not have been placed into the stream of commerce.

233.    Plaintiffs Steven Morales, Brandi Morales, Ann Morales, S.M., and A.M., and their decedent, S.A.M., were persons who would reasonably be expected to use or be affected by the Tire.

234.    It was foreseeable to Goodyear that the Tire would suffer a tread separation and that this would lead to a loss of control and a rollover crash as occurred in the subject collision.

235.    Defects in the subject Tire were a proximate cause of the subject rollover crash and of the Plaintiffs' injuries and damages.

43

236.   Defects in the subject Tire were a proximate cause of the wrongful death of S.A.M. and of the Plaintiffs' injuries, damages, and losses due to the death of S.A.M.

237.   Goodyear is strictly liable to the Plaintiffs for injuries and damages caused by defects and inadequacies in the design, manufacture, and warnings of the subject Tire.

238.   As a direct and proximate result of the aforesaid defective and unreasonably dangerous condition of the Tire, Plaintiffs suffered serious injuries and damages.

WHEREFORE, Plaintiffs pray for an award of damages against Goodyear to be fixed by the trier of fact in a reasonable amount.

## EIGHTH CAUSE OF ACTION

### (Negligence – Against Goodyear)

239.   Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if set forth fully herein.

240.   At all times herein relevant, Goodyear was engaged in the business of designing, manufacturing, testing, selling, and placing tires into the stream of commerce, including the Tire in the subject Expedition, throughout the United States and throughout the state of ldaho.

241.   Goodyear had a legal duty to conform its conduct in conformance with the law and that of a reasonable corporation, which includes adequately and properly manufacturing, designing, testing and selling its products, including the subject Tire, and acting without negligence, conscious disregard, willful, reckless, despicable or other wrongful conduct.

242.   Goodyear had a duty to design the Tire to provide reasonable protection to occupants using and relying on that tire.  Specifically, Goodyear had a duty to design the Tire such that it was not unduly and unreasonably susceptible to catastrophic failure, such as the tread separation that occurred here and which resulted in the subject rollover crash.

44

243. Goodyear had a duty to design the Tire such that it would not fall apart and suffer a tread separation that Goodyear knew would lead to a loss of control and potential deaths and serious injuries.

244. Goodyear had a duty to design the Tire such that it would not create an unreasonable risk of harm to vehicle occupants using the Tire under normal, foreseeable driving conditions.

245. Goodyear negligently designed, tested, manufactured, marketed, distributed, sold and supplied the Tire in that it failed to exercise reasonable care to prevent the Tire from creating an unreasonable risk of harm to persons who might reasonably be expected to use it in an expected or reasonably foreseeable manner.

246. Goodyear's acts of negligence include but are not limited to the conditions described in the following paragraphs and elsewhere in this Complaint.

247. Goodyear negligently failed to include a nylon overlay in the design of the Tire. At the time the tire was designed and manufactured, it was technologically feasible and cost effective to include a nylon overlay in the Tire. At the time the subject Tire was manufactured, nylon overlays were commonly and routinely used throughout the tire industry and were well known to prevent tread separations. Goodyear nonetheless designed and manufactured the Tire without a nylon overlay.

248. At the time the Tire was designed and manufactured, there was a safer, alternative design that would have prevented the tread separation causing the loss of control and the ensuing rollover accident – namely, a nylon overlay. It was well known throughout the tire industry and it was well known to Goodyear at the time the Tire was designed and manufactured that nylon overlays are extremely effective in preventing and eliminating tread separations. Despite this knowledge, Goodyear designed and manufactured the Tire without a nylon overlay.

45

249. Goodyear knew that belt edge reinforcement was necessary to minimize and prevent tread separations from occurring, but Goodyear designed and manufactured the Tire without any adequate belt edge reinforcement, such as a nylon overlay or a Kevlar overlay, both of which Goodyear used in other tires manufactured years before the subject Tire was designed and manufactured.

250. At the time the Tire was designed and manufactured, Goodyear also knew that tread separations of the type that occurred here significantly reduced the ability of a driver to control the vehicle *and* that this loss of control is likely to lead to rollover crashes. Goodyear also knew that the likelihood of a crash after a tread separation is far greater when the tread separation occurs on an SUV such as the subject Expedition. Goodyear nonetheless failed to include a nylon overlay in the subject Tire, thus knowing that tread separations, loss of control, and rollover crashes would likely occur as a result of its negligent conduct.

251. Goodyear knew from its experience involving tires manufactured before the manufacture of the subject Tire that adding a nylon overlay can assist in preventing and eliminating tread separations. Before the subject tire was manufactured, Goodyear added nylon overlays to other Goodyear tires which significantly reduced or eliminated the instances of tread separations occurring in those tires. Despite this knowledge, Goodyear manufactured the subject Tire without a nylon overlay.

252. Goodyear started putting nylon overlays or nylon cap plys on some of its tires in the 1990s. Goodyear knew then that nylon overlays or cap plys provide important and effective protection against tire tread separations, yet Goodyear failed to include a nylon overlay in the subject Tire manufactured decades later.

253.     At the time that the Tire was designed and manufactured, Goodyear knew of the critical importance of the inner liner and that a thin inner liner would be less effective in retaining air pressure in a tire.

254.     At the time that the Tire was designed and manufactured, Goodyear had designed and manufactured other tires with thicker inner liners, which Goodyear knew would have superior performance in retaining tire pressure.

255.     Goodyear breached its duty to design the Tire to provide reasonable protection to those using the Tire and failed to conform its conduct in conformance with the law and that of a reasonable corporation, causing the injuries and damages to Plaintiffs.

256.     In particular, Goodyear breached its duties to consumers and users of its tires by manufacturing, selling and providing tires, including the subject Tire, that were unreasonably susceptible to tread separation under foreseeable driving conditions.

257.     At the time of the design and manufacture of the Tire, Goodyear was ware or should have been aware of the defects in the Tire but inserted it into the stream of commerce anyway, without seeking to design out the defects, guard against them, or provide any type of reasonable or adequate warnings to consumers such as the Plaintiffs.

258.     At the time of the design and manufacture of the Tire, Goodyear was aware or should have been aware of safer alternative designs that were technologically and economically feasible, but Goodyear knowingly chose not to incorporate those alternative designs into the Tire.

259.     At the time of the design and manufacture of the Tire, Goodyear was aware or should have been aware of the susceptibility of the Tire to literally break apart and suffer a catastrophic failure, which Goodyear knew would cause the loss of vehicle control and subject users of that Tire to the risk of catastrophic injuries or death.

260.    Specifically, at the time of the design, manufacture, and sale of the Tire, Goodyear was aware that the Tire was unduly and unreasonably susceptible to failing and suffering a tread separation during foreseeable, intended use due, in part, to the lack of nylon overlay, which Goodyear knew would prevent such catastrophic failures.  In fact, long before the subject accident, Goodyear had been put on notice numerous times that similar Goodyear tires without a nylon overlay had suffered tread separations, causing vehicles to lose control and crash and resulting in serious injuries and deaths to American consumers. This notice included lawsuits filed against Goodyear on behalf of consumers who were killed or seriously injured when their Goodyear tires catastrophically failed and caused injurious or fatal crashes.

261.    It is believed that Goodyear keeps track of lawsuits filed against it in product liability actions, and it is expected that Goodyear will readily produce a list of all claims and lawsuits filed before the subject accident in which it was alleged that death or serious injury occurred to an occupant due to the failure of a Goodyear tire that lacked a nylon overlay or other suitable belt edge reinforcement. Despite this knowledge of the defects in the Tire, Goodyear did nothing to warn or inform consumers of the risk or to recall the defective product.

262.    Goodyear knew or should have known that the Tire posed serious safety risks to potential users, but it nonetheless inserted the Tire into the stream of commerce for use on vehicles such as the subject Expedition.

263.    Goodyear failed to provide a Tire with an adequate inner liner that would adequately contain inflation pressure and avoid premature rubber deterioration.

264.    Goodyear knew that it was critical to manufacture tires such that the components properly and adequately adhered together, but Goodyear failed to manufacture the Tire with proper adhesion between the Tire's components. Goodyear knew proper adhesion was necessary to

prevent catastrophic tire failures like tread separation and that proper adhesion between components would minimize the risk of catastrophic tire failures such as that which occurred here.

265. Goodyear failed to manufacture the Tire with proper quality control and quality assurance procedures, which would have minimized the probability of the Tire containing numerous areas of poor adhesion between its components.

266. Goodyear failed to design and manufacture a Tire that was reasonably safe for its foreseeable usage.

267. Goodyear engaged in inadequate testing of the Tire.

268. Goodyear engaged in inadequate failure mode and effects analysis of the Tire and/or ignored safety risks that a reasonable failure mode and effects analysis would have predicted and revealed.

269. At the time of the design and manufacture of the Tire, Goodyear was aware or should have been aware of the dangers of tire failures such as the tread separation that occurred here, including the risk of death or serious injury from crashes.

270. Despite the knowledge described herein, Goodyear nonetheless failed to adequately design and manufacture the Tire.

271. Goodyear's knowledge as described in this Complaint is believed to be reflected in reports of other incidents involving Goodyear tires.

272. Goodyear's knowledge as described in this Complaint is believed to be reflected in Goodyear's compilations and analyses of accident data.

273. Goodyear's knowledge as described in this Complaint is believed to be reflected in results of tests conducted by Goodyear and others.

274.    Goodyear's knowledge as described in this Complaint is believed to be reflected in the results of other studies and analysis conducted by Goodyear and others.

275.    Goodyear breached its duty to design and manufacture the Tire to provide reasonable safety to users.

276.    Goodyear breached its duty to provide a Tire that would not suffer a catastrophic failure under normal, expected and foreseeable driving conditions.

277.    Goodyear acted unreasonably in designing, manufacturing, distributing, marketing, and selling a Tire that presented a substantial and unreasonable risk of injury or death to occupants of a vehicle containing that tire, including the Plaintiffs and the Plaintiffs' decedent.

278.    In designing, manufacturing, failing to adequately test, assembling, distributing, marketing, and selling the Tire as described elsewhere herein, Goodyear engaged in willful, wanton, and reckless misconduct as those terms are defined in law insofar as it knew or should have known that its actions described herein not only created an unreasonable risk of harm to others (namely, consumers and users of the Tire) but involved a high degree of probability that such harm would result, including in accidents following tread separations such as the subject rollover collision at issue in this case.

279.    As a direct and proximate result of the negligent and unlawful conduct of Goodyear described herein, Plaintiffs incurred substantial injuries damages, which are set forth elsewhere herein.

280.    Goodyear's negligent and unlawful conduct was a proximate cause of the wrongful death of S.A.M. and of Plaintiffs' injuries, damages, and losses resulting from his death.

281.    Goodyear's negligent and unlawful conduct was a proximate cause of the serious personal injuries and resulting damages to Plaintiffs.

50

WHEREFORE, Plaintiffs pray for an award of damages against Goodyear to be fixed by the trier of fact in a reasonable amount.

## NINTH CAUSE OF ACTION

### (Breach of Express and Implied Warranties – Goodyear)

282.    Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if set forth fully herein.

283.    At all relevant times, Goodyear knew the particular purposes for which the Tire was required and was to be used, and that purchasers and users such of the Tire would rely on Goodyear's skill and judgment in designing, testing, manufacturing, distributing, furnishing, and selling goods that were suitable for such purposes.

284.    The Tire was not free from defects or fit for the purpose for which it was to be used and was, in fact, defectively designed, manufactured, and distributed and imminently dangerous to users and, in fact, did cause serious and permanent injuries to the users thereof while being used for its intended purpose in a manner reasonably foreseeable to Goodyear. As a result, the subject Tire was unsafe and dangerous for use by the consumer and in particular by the occupants of the Expedition who were using the Tire at the time of the accident – the six members of the Morales family.

285.    Goodyear expressly and impliedly warranted to foreseeable purchasers and users of the subject Tire, including the general public and the Plaintiffs, that its products, including the subject Tire, were suitable for their intended use, were of merchantable quality, and had no substantial risk of sudden failure.

286.    The subject Tire was defective and was not of merchantable quality and was not fit for its intended purpose in that the Tire was capable of causing and, in fact, did cause serious and

catastrophic permanent injuries to users and consumers thereof, including Plaintiffs, while being used in a manner reasonably foreseeable to Goodyear.

287.    Goodyear chose and selected all the components and raw materials for the Tire.

288.    Goodyear knew or should have known of prior claims resulting from the Tire and similar tires not performing as intended yet still chose to sell the Tire and chose not to provide warnings or to recall the Tire.

289.    The Tire was unreasonably dangerous in its design, marketing, and manufacture before it was placed into the stream of commerce by Goodyear and sold to Plaintiffs.

290.    Goodyear knew or should have known that the design and manufacturing of the subject Tire was defective and unreasonably dangerous, and that such defects were present at the time the Tire was manufactured, assembled, distributed, and sold.

291.    As a direct and proximate result of Goodyear's breach of warranties, Plaintiffs suffered serious injuries and past, present, and future special and general damages set forth elsewhere herein and incorporated by this reference.

292.    Goodyear's breach of warranties directly and proximately caused the wrongful death of S.A.M. and Plaintiffs' injuries, damages, and losses resulting from his death.

293.    As a direct and proximate result and consequence of each breach of Goodyear's implied and express warranties as discussed herein, Plaintiffs suffered injuries, damages, and losses more fully described elsewhere herein.

WHEREFORE, Plaintiffs pray for an award of damages against Goodyear to be fixed by the trier of fact in a reasonable amount.

**COUNTS AGAINST ALL DEFENDANTS**

**TENTH CAUSE OF ACTION**

**(Causation and Damages)**

294. Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if set forth fully herein.

295. As a direct and proximate result of the Defendants' negligent and wrongful conduct and defective products set forth elsewhere herein, Plaintiffs have suffered injuries and damages including but not limited to:

   a. Past, present, and future general damages, including, but not limited to physical pain and suffering; emotional pain and suffering; and loss of enjoyment of life, each in an amount to be established at trial;

   b. Past, present, and future special damages, including, but not limited to reasonable and necessary medical, hospital, and rehabilitation care and services, nursing care and services, medications, therapies and other expenses, past and future, including special medical damages, each in an amount to be established at trial;

   c. Inconvenience;

   d. Permanent disability and permanent impairment, including cognitive and physical impairment, each in an amount to be established at trial;

   e. Disfigurement, in an amount to be established at trial;

   f. The wrongful death of S.A.M., including grief, loss of companionship, mental anguish, and emotional distress resulting from his death, in an amount to be established at trial;

   g. Any appropriate exemplary damages; and

53

h. All such other monetary relief and compensatory damages as permissible at common law and by statute and to which Plaintiffs are entitled.

## JURY DEMAND

Plaintiffs request a jury trial of all issues in this case.

## PRAYER

WHEREFORE, Plaintiffs pray for entry of a judgment against Defendants in an amount to be determined by the trier of fact for the following damages:

a. Past, present, and future general damages, including, but not limited to physical pain and suffering; emotional pain and suffering; and loss of enjoyment of life in an amount to be established at trial;

b. Past, present, and future special damages, including, but not limited to reasonable and necessary medical, hospital, and rehabilitation care and services, nursing care and services, medications, therapies and other expenses, past and future, including special medical damages, each in an amount to be established at trial.

c. Inconvenience, in an amount to be established at trial;

d. Permanent disability and permanent impairment, including cognitive and physical impairment, each in an amount to be established at trial.

e. Disfigurement in an amount to be established at trial.

f. The wrongful death of S.A.M., including grief, loss of companionship, mental anguish, and emotional distress resulting from his death, in an amount to be established at trial.

g. Any appropriate exemplary damages; and

h. All such other monetary relief and compensatory damages as permissible at common law and by statute and to which Plaintiffs are entitled, including costs of Court, pre-judgment and post-judgment interest, and attorney fees as may be available in law or equity.

WHEREFORE, Plaintiffs pray for and demand an award of damages to be fixed against the Defendants by the trier of fact in a reasonable amount. Additionally, Plaintiffs ask for the costs of this action, reasonable attorney fees, all pre-judgment and post-judgment interest as provided by Law, and for all such other relief to which they are legally entitled and as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

Respectfully submitted this 27th day of May, 2025.

s/ *Douglas W. Crandall*
Douglas W. Crandall
Crandall Law Office
Veltex Building
420 W. Main Street, Suite 206
Boise, Idaho 83702

and

Paul J. Komyatte
The Komyatte Law Firm LLC
722 Washington Ave., Unit 202
Golden, CO 80401
(pro hac vice application to be submitted)

ATTORNEYS FOR PLAINTIFFS